**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-297 (RC)** |
| **v.** | : | |
| | : | |
| **TREVOR CAIN,** | : | |
| | : | |
| **Defendant** | : | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Trevor Cain to 12 months of incarceration—above the advisory Guidelines range of 0 to 6 months—followed by 12 months of supervised release. The government also requests that this Court impose 60 hours of community service, $50 special assessment, and, consistent with the plea agreement in this case, $500 in restitution.

## I.      Introduction

Defendant Trevor Cain, a 40-year-old woodworker from Aurora, Ohio, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9

Cain pleaded guilty to violations of 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(G). The government's recommendation is supported by the defendant's (1) assault of an unidentified person on the National Mall on the morning of January 6, 2021; (2) documentation of his and other rioters' crimes during their breach of the U.S. Capitol Building; (3) leadership role amongst his fellow rioters as he navigated them to the Senate with the intent to disrupt the certification of the 2020 Election; (4) choice to join a mob as it pushed up again a police line outside the Old Senate Chamber; and (5) lack of remorse demonstrated in an interview immediately after his crimes, likening his actions to the Allies storming the beaches of Normandy, France.

The Court must also consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Cain's crime support a sentence of 12 months of incarceration in this case.

## II.    Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 31 (Statement of Offense or SOO) at ¶¶ 1–7.

### Defendant Cain's Role in the January 6, 2021 Attack on the Capitol

Cain traveled to Washington, D.C. on January 6, 2021, to attend the rally of President Trump to register his dissent with the 2020 Presidential Election. Cain traveled from Cleveland,

---

million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Ohio overnight as part of a seven-bus caravan coordinated through an organization called Free Ohio Now. *See id.* at ¶ 8.

Sometime in the morning of January 6, 2021, Cain gave a speech at the Lincoln Memorial using his megaphone and holding his flag. Cain stated, among other things, "[O]bedience to God is resistance to tyrants. How'd it work out for Pharoah, huh? We're here to call out all these modern-day Pharoahs like Pelosi, like Biden. You guys are a bunch of chump Pharoahs . . . . We're here to tell you that . . . all of you are false idols. Every single one of you, Biden, Pelosi, AOC . . . We are here to call out the merchants of death. We are here to tell them, go back to where you came from, you scum." *See id.* at ¶ 10.

At this point during Cain's speech, another individual nearby spat on the ground near Cain. After exchanging words, Cain walked towards the individual, saying, "Come on boy, you wanna get tough?" Cain then hockey-checked the individual to the ground, and pushed him while he was on the ground. Another man kicked the downed individual. *See id.* at ¶ 11; *see also* Image 1.



*Image 1: Cain (circled red) hockey-checked an individual who spat near him*

Moments later, Cain spoke with an individual filming the near Lincoln Memorial. The other individual celebrated Cain's assault, to which Cain responded in part, "That punk leftist psycho just spit on a patriot. Ain't happening. You ain't spitting on patriots anymore and getting away with it." Cain then continued with his speech to the crowd using his megaphone, stating in part, "Now, I gotta believe that when Jesus had that whip, and he drove those money-changers out of the temple, I think he got them with that whip a couple of times, what do you think? I'm telling ya, obedience to God is resistance to tyrants . . . Who wants to take the promised land today? Remember that song, this land is my land, this land is your land. Anywhere in that song I don't think I heard it say this is the government's land. . . ." *See* SOO at ¶ 12.

At approximately 10:41 a.m., as Cain walked from the Lincoln Memorial towards the Washington Monument, he explained that he had "spirit of liberty rising up in me at the Lincoln Memorial, just had to let it rip," but that when a "leftist punk" spat on him, he "hockey-checked that little boy down to the ground." *See id.* at ¶ 13.

Cain attended former President Trump's "Stop the Steal" speech near the Ellipse. During the speech, President Trump made repeated reference to Vice President Pence and called on the Vice President to "do the right thing" and return the certification of the 2020 Presidential election to the states. After the speech, Cain joined the crowd walking to the Capitol. *See id.* at ¶ 14.

As he approached the Capitol, Cain knew that others had stormed the Capitol in order to stop the certification of the election. On one of the videos obtained from his phone, at approximately 1:58 p.m., Cain stated, "[M]illions of people, not accepting the stolen election or fraudulent election. We're here having our voices heard, people have already stormed the steps of the Capitol. Boom, coming your way, you swamp creatures." In another video from Cain's phone, at approximately 2:01 p.m., near the Peace Circle, Cain stated, "Patriots are storming the chambers right now, I guess. That's the breaking news right now. Crazy, it's just so awesome." Cain also repeated several times, "The safest place to be is in the eye of the storm." Cain further stated, "The foundations of this Capitol were not laid with communist propaganda, but with 1776 as the cornerstone." Cain again acknowledged, "This is amazing. . . They're storming the Capitol right now, they're storming the stinking Capitol right now. Uncle Sam says there's plenty of room. There's plenty of room for patriots!" Cain asked another rioter, "Are they getting in the chamber, what's going on? They're getting in the chamber last I heard." *See id.* at ¶ 15.

As he got closer to the Capitol, Cain heard and saw law enforcement deploy crowd control munitions against the crowd. Cain responded by shouting in the direction of the explosions, "Get

out of here you commies, this is our country." Cain stated to himself, "Wow, they're doing flash bangs.  This is unreal." *See id.* at ¶ 16.

At approximately 2:16 p.m., Cain proceeded up the stairs to the Upper West Terrace, adjacent to the scaffolding erected for the upcoming inauguration. Cain entered the U.S. Capitol Building through the Senate Wing Door at approximately 2:20 p.m, just minutes after the initial breach. A still image from that footage is included below with Cain circled in red. *See id.* at ¶¶ 17–18; *see also* Image 2.



*Image 2: Cain (circled red) entered the Capitol Building through the Senate Wing Door at approximately 2:20 p.m.*

As he entered, Cain filmed the shattered glass in the Senate Wing Door, and an alarm was audible. Cain stated to himself, "we are inside the Capitol building dude . . . Patriots, unbelievable. . . . Our chamber, our House . . . ."  *See* SOO at ¶ 19; *see also* Image 3.



*Image 3: Cain (behind the camera) filmed the shattered Senate Wing Door as he entered*

Cain then proceeded to the Crypt. As captured on a video from his phone at approximately 2:26 p.m., the mob in the Crypt began chanting loudly, "Stop the Steal!"  Cain stated in part, "This is so unprecedented, this is history in the making, this is history in the making. . . We took the House back. . . we took the Capitol. . . . This is our country. This is our country. This is our country! It doesn't belong to Pelosi, Biden, Schumer, McConnell. It belongs to us!" Another rioter yelled loudly, "Mike Pence is a traitor!" Cain left the Crypt and proceeded towards the Rotunda at approximately 2:31 p.m. *See* SOO at ¶ 20; *see also* Image 4.



*Image 4: Cain (circled red) proceeded with rioters near the Memorial Door up to the Rotunda*

As he joined the crowd from the Crypt going upstairs to the Rotunda, at approximately 2:32 p.m., Cain led the mob in chants and singing. Cain led the crowd in a call-and-response of "Who do they work for? Us!" and sang a portion of the *Battle Hymn of the Republic*. Cain arrived in the Rotunda at approximately 2:34 p.m. In the Rotunda, Cain acknowledged on a video from his phone, "Yeah, we had to break a door and a window to get back in here. Hey, but it's our house so it's ok anyways." *See* SOO at ¶¶ 21–22

At approximately 2:36 p.m., as captured on a video from his phone, Cain stated in part, "This is how history is made. Artisans, woodworkers, laborers, people of all stripes saying this is it. . . . This is what we fought for, 1776 . . . This is what 1776 was all about. . . This is our house . . . Welcome to history, ladies and gentlemen, January 6th, 2021, when we took our country back. When we said no more to the career politicians. No more to these commies. Not on my watch. Not on anybody's watch who's a patriot." *See id.* at ¶ 23.

Cain also paused parading around the Rotunda to celebrate with other rioters. At approximately 2:40 p.m., Cain told another group of rioters, "Mark this day guys, January 6th,

2021, history was made, the people took the house back." Cain also again sang a portion of the *Battle Hymn of the Republic* with other rioters. *See id.* at ¶ 24.

At approximately 2:44 p.m., Cain walked up to a group of individuals in military gear within the Rotunda and said, "Hey! Guess who's not trespassing." Cain continued, "that's actually a fact, that's not like some stupid leftist shit lie." Cain then stated to one member of the group, "The Senate's on this side, right? And the House is on that side?", and correctly pointed in each direction. *See id.* at ¶ 25.

Immediately after that conversation, at approximately 2:45 p.m., Cain walked north towards the Senate. As he walked, Cain pointed in the direction of the Senate, and other rioters followed Cain towards the Senate. *See id.* at ¶ 25; *see also* Image 5.



*Image 5: Cain (circled red) pointed other rioters in the direction of the Senate*

North of the Rotunda is an additional small rotunda, a hallway outside the Old Senate Chamber, and then the Senate Chamber itself. Cain joined the growing group of rioters in the hallway outside the Old Senate Chamber. *See* Image 7. At this time, a line of police officers with the Metropolitan Police Department (MPD) was engaged in violent conflicts defending the hallway and the entrance to Senate Chamber. Cain was aware that these officers were attempting

to remove the rioters from the area. Specifically, as he left the area, Cain stated to another rioter "Back up, they're spraying," meaning that Cain was aware that law enforcement was deploying a chemical irritant in an attempt to disperse rioters. *See* SOO at ¶ 27; *see also* Image 6.



*Image 6: Cain (circled red) near the Old Senate Chamber*

Cain proceeded back to the Rotunda and then entered the lobby near the Columbus Doors of the Capitol. Cain exited the Capitol through the Columbus Doors at approximately 2:51 p.m. *See* SOO at ¶ 28.

Shortly after exiting the Capitol, Cain participated in an interview on the East steps of the Capitol. Cain described his experience at the Capitol to the interviewer, "History was in the air, man. History was in the air. And before you know it, we're storming like the . . . beaches of Normandy, the Capitol, take it back, because it's not some dumb phrase, this is our house." *See id.* at ¶¶ 29–30.

The interviewer asked whether Cain supported people storming inside and cops fighting with people. Cain stated, "Absolutely because nobody's vandalizing anything, we're respecting our lineage, our heritage by the paintings and the sculptures. This is what the founders had in mind. When shit gets out of control and commies are trying to take your country over, this is what

you do. Peacefully. And yeah, there's a couple of windows broken to get in but sometimes you gotta get . . . break a window to get back into your own house." *See id.* at ¶ 31.

The interviewer then asked whether Cain thought the election would be overturned and President Joe Biden would not be inaugurated, Cain responded, "Well I sure hope to God man, because if it . . . it isn't, this is proof that we are living in two different realities right now. The Facebook, Zoom fake reality of Joe Biden who lives in his basement. They can have their fake inauguration, but we're going to have a real one with real patriots who have real courage to show up in person. So I want to say to everybody out there, come on! Have courage! Be a patriot! What your forefathers died for. This is what it means – '76 [gesturing to flag]." *See id.* at ¶ 32.

The interviewer then asked Cain what would lead him to accept Joe Biden as President. Cain responded, "It's a great question, man. But if there's anybody who's illegitimate, it's the commie agent Joe Biden. If there's anybody who you can say not my president, it's Joe Biden." The interviewer then asked Cain whether he thought former President Trump had good advisors given that election cases had been tossed out of court. Cain responded, "There's definitely a crazy amount swirling. But there's one thing that why we're all here is that we trust Trump as a man of the people. And it's messy, and but that's what '76 was. It was messy, boys and girls. It was not cut and dry. It was not, 'oh what the fake news wants you to think something should be like'. So yeah, it's messy with Trump but he's for the people. And so I don't know how this thing is going to shake out, but I know this is history. Mark this day on your calendar, January 6, 2021." *See id.* at ¶¶ 33–34.

### The Charges and Plea Agreement

On August 30, 2023, the United States charged Cain by a five-count Indictment with violating 18 U.S.C. §§ 1512(c) and 2, 1752(a)(1), and 1752(a)(2) and 40 U.S.C. §§ 5104(e)(2)(D)

and (G). On August 7, 2024, pursuant to a plea agreement, Cain pleaded guilty to Count 2 and 5 of the Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(G).  By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

**III.     Statutory Penalties**

Cain now faces a sentencing for violating 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to twelve months of imprisonment and a fine of up to $100,000 for Count 2 and up to six months of imprisonment and a fine of up to $5,000 for Count 5. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

**IV.     The Sentencing Guidelines and Guidelines Analysis**

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government generally agrees with the Sentencing Guidelines calculation set forth in the PSR:

GUIDELINES CALCULATION FOR A VIOLATION OF 18 U.S.C. § 1752(a)(1):

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A))[2] | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Total Adjusted Offense Level | 4 |

*See* PSR at ¶¶ 48–57 (omitting application of zero-point offender adjustment). The PSR, however,

applies the zero-point offender adjustment. *See id.* at ¶¶ 56–57.  Section 4C1.1 does not apply in

this case.

The zero-point offender adjustment applies a two-point reduction to defendants who have

no prior criminal history points, *id*. § 4C1.1(a)(1), and who did not engage in specially disfavored

conduct, *id*. § 4C1.1(a)(2)–(10). Most relevant here is that the defendant must not have "use[d]

violence or credible threats of violence in connection with the offense." *Id*. § 4C1.1(a)(3).  When

examining whether the defendant's conduct posed a credible threat of violence, the Court must

consider the totality of the circumstances surrounding the defendant's conduct.  *See e.g., United

States v. Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12 ("In evaluating whether

credible threats of violence were posed by the defendant's offense conduct, to my mind, the context

matters very critically. . . . [E]valuating a defendant's offense conduct requires examination of all

the factors of the offense including what the particular defendant being sentenced did; where he

was; what he was seeing; what a person would reasonably understand was the volatility of the

situation; the threat that whole situation would pose to others; the foreseeable harm of the situation;

---

[2] The PSR incorrectly applies this specific offense characteristic because the trespass occurred "at a secure government facility" under U.S.S.G. §2B2.3(b)(1)(A)(i). PSR ¶ at 50. As indicated in the defendant's plea agreements, the specific offense characteristic applies because the trespass occurred "at any restricted building or grounds" under U.S.S.G. §2B2.3(b)(1)(A)(vii). ECF No. 30 at 3. On January 6, 2021, the U.S. Capitol was restricted because protectees of the United States Secret Service were visiting. *See* 18 U.S.C. § 1752(c)(1)(B). Because a two-level increase applies under either theory, there is no difference to the final offense level.

and the consequences of the specific defendant's individualized actions.  So the fact that this defendant is not personally charged with assaulting or attacking officers is, therefore, not sufficient to make him eligible for the zero criminal history score offense-level reduction.").

The government does not dispute that the defendant has no criminal history points. Consequently, his eligibility for the reduction comes down to whether he used violence or a credible threat of violence in connection with his offense. The burden is on the defendant to prove he satisfies the criteria of § 4C1.1. The defendant cannot meet this burden. While the defendant did not use violence, his actions constituted a credible threat of violence. The defendant's threats of violence were credible because: (1) he physically assaulted another individual in the morning of January 6, 2021, SOO at ¶ 11;[3] (2) following deployment of crowd control munitions by law enforcement, he shouted, "Get out of here you commies, this is our country," SOO at ¶ 16; (3) he joined a mob which was chanting, "Stop the Steal!" to which the defendant added, "We took the House back . . . we took the Capitol . . . It belongs to us," SOO at ¶ 20; (4) he acknowledged the mob he joined had to "break a door and a window to" breach the U.S. Capitol Building, SOO at ¶ 22;[4] (5) after guiding other rioters to the Senate Chamber, he joined a mob of rioters confronting a police line, who felt so threatened that they, by his own admission, were deploying chemical irritant in an attempt to disperse the mob, SOO a ¶¶ 27–28.[5]

---

[3] While this assault occurred prior to the commission of the offenses to which Cain has pleaded guilty, it nevertheless constitutes the totality of the circumstances when objectively determining whether his conduct posed a credible threat of violence on January 6, 2021. *See Andrulonis*, No. 23-cr-085 (BAH), Sentc'g Hrg. Tr. at 11-12.

[4] Threats of violence against property—not just against persons—renders the zero-point offender adjustment inapplicable. For example, Judge Nichols denied application of § 4C1.1 in *United States v. Clive Kincaid*, 23-cr-308 (CJN), Sentc'g Hrg., because Kincaid used violence when breaking a window to the House Chamber Doors.

[5] In *United States v. Alexander Secor*, Judge McFadden dealt with a near identical issue and concluded that the adjustment did not apply. *See* No. 1:21-cr-00157 (TNM), U.S. Dist. LEXIS 122600 (D.D.C. July 12, 2024). In that case, Judge McFadden had previously concluded that Secor

Due to the unique nature of the January 6 mob, the harms caused by the January 6 riot, and the significant need to deter future mob violence, the government submits that even if the Court were to find that § 4C1.1 applies, the Court should nevertheless vary upwards by two levels to counter any reduction in offense level. Such treatment would recognize the unique nature of the criminal events of January 6, 2021, coupled with the overwhelming need to ensure future deterrence, despite a person's limited criminal history.

Finally, to avoid unnecessary litigation, if the court declines to apply § 4C1.1, the government requests that the Court make clear at sentencing that it would have imposed the same sentence regardless of whether § 4C1.1 applies.[6]

The U.S. Probation Office calculated Cain's criminal history as a 0 (e.g. category I). PSR at ¶ 60. Accordingly, the U.S. Probation Office calculated Cain's total adjusted offense level after acceptance at 4, and after the zero-point offender adjustment at 2, and his corresponding Guidelines imprisonment range under either adjusted offense level at 0–6 months. PSR at ¶ 94. Cain's plea agreement contains an agreed-upon Guidelines' calculation that generally mirrors the U.S.

---

had not engaged in "actual violence against law enforcement." *See id.* at *5. However, that court found that "Secor joined a mob of two dozen others and worked with them to box outnumbered police officers against a door." *See id.* "Confronted by a crowd of that size and agitation taking those actions, the officer would have understood there to be an 'implied' 'declaration . . . of an intent to inflict loss or pain' on him. That is especially true considering the broader context of the riot at the Capitol that day . . . ." *See id.* at *6 (citing *United States v. Bauer*, No. 1:21-cr-00386-2 (TNM), 2024 U.S. Dist. LEXIS 14897, at *3). The court also found that Secor engaged in threats of violence even though they were "nonverbal." *See id.* Like Secor, Cain joined a mob that confronted a police line. Worse than Secor, Cain continually verbalized statements of taking over the U.S. Capitol Building and led other rioters directly to a mob confronting law enforcement. Law enforcement considered that mob a threat as evidenced by their deployment of chemical irritant.

[6] U.S.S.G. § 5C1.1 has also been amended with a new application note providing that if a defendant receives an offense level reduction under §4C1.1 and either their applicable guideline range is in Zone A or B of the Sentencing Table, or the guideline range overstates the seriousness of the offense, imprisonment may not be appropriate. *See* U.S.S.G. § 5C1.1, comment. n. 10. The government submits that for the same reasons that § 4C1.1 should not be applied in this case, a sentence of imprisonment is appropriate notwithstanding Application Note 10 to § 5C1.1.

Probation Office's calculation. The only difference is with respect to the zero-point offender adjustment. On that issue, the plea agreement states the following: "The parties agree that the burden is on the defendant to prove that the defendant satisfies all the criteria in § 4C1.1 to be eligible for the adjustment. The government reserves the right to oppose application of the criteria for an adjustment under this section." *See* ECF No. 30 at 4.

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because the defendant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

Defendant was an avid and willing participant in an unprecedented crime. He joined a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Cain "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Defendant would face the same offense level if his crimes had not endangered the democratic process or interfered

with the peaceful transfer of power.[7] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. Consequently, a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

Several judges of this Court have imposed upward variances in January 6 cases precisely because in a post-*Fischer* world, the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Reffitt,* 21-CR-32-DLF, Mem. Op. and Order 4/10/24 at 10–11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-638-TJK, Sent. Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it

---

[7] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *Fischer v. United States*, 603 U.S. 480 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 603 U.S. at 506 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

. . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[8]

In past sentencings, this Court has made clear its view that January 6 was unprecedented: "The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86. Those were not merely empty words—they were a recognition of the seriousness and unprecedented nature of the riot. Because the seriousness of defendant's crime is not adequately captured by the applicable Guideline, the government respectfully requests that the Court vary upwards from the top of the Guidelines range.

---

[8] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

## V.  Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of 12 months incarceration.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Cain's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Cain's case is his use of violence on the morning of January 6, 2021. His assault on the National Mall suggests a motivated rioter, whose unlawful presence with the U.S. Capitol Building that day not only disrupted the certification of the 2020 election but posed a credible threat to law enforcement. His rhetoric during his riotous activities also suggests the same.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B.  Cain's History and Characteristics

As set forth in the PSR, Cain has a criminal history consisting of obstruction of official business and assault from 2008. He was sentenced to 180 days confinement, with 175 days suspended, for the assault, and 90 days confinement, with 89 days suspended, for the obstruction.

His prior crimes parallel his activities on January 6, 2021 and show a pattern of unlawful activity, disregard for the law, and the use of violence.

Additionally, Cain is a small business owner, but in his interview with probation, Cain continues to deflect blame for his actions. He suggests that his business has had difficulties because, "Marxist and Communist groups made it their full-time job to destroy the lives and businesses of the people who attended the US Capitol on January 6, 2021." *See* PSR at ¶ 70. In any case, he had avoided additional public ire by reincorporating his business under his wife's name to obfuscate his involvement in the January 6, 2021 riot. *See id.* And while it is laudable that Cain has built a small business, it was his choice to tarnish his reputation.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Cain has a criminal history consisting of obstruction of official business and assault from 2008. He engaged in the same types of crimes on January 6, 2021. And although he has accepted responsibility by pleading guilty, the Court should view any remorse expressed at sentencing with skepticism at best. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).

Cain did not accept the results of the 2020 presidential election, so on January 6 he steeled

21

for and engaged in violence. Cain encouraged others while breaching the U.S. Capitol Building himself and immediately afterwards in an interview showed zero remorse for his actions, likening his actions to the Allies storming the beaches of Normandy, France. The Court must sentence Cain in a manner sufficient to deter him specifically, and others generally, from going down that road again.

### E. The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[9] This Court must sentence Cain based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Cain pleaded guilty to Count 2 and 5 of the Indictment, charging him with a violation of 18 U.S.C. § 1752(a)(1) and 40 U.S.C. § 5104(e)(2)(G).  Count 2 is a Class A misdemeanor, while Count 5 is a Class B misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), apply to both counts.

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Dillard*, this Court sentenced Dillard to 4 months of incarceration following a misdemeanor guilty plea. Dillard had entered room ST-2M through a broken window and touched a law enforcement officer's helmet. While Cain did not engage in the physical contact with law enforcement, the nature of the physical assault Cain did engage in against the unidentified victim was far worse that Dillard's—it was a self-admitted hockey-check. Moreover, Cain's overall conduct was significantly worse than Dillard's. Cain's preparation, malintent, and ultimate participation in violence that day not only makes Cain's case significantly more serious, but so too does the end goal behind it: to disrupt an important step in the nation's peaceful transfer of power. Dillard was never indicted for 18 U.S.C. § 1512, and even though the government intends on dismissing the 18 U.S.C. § 1512 charge in part due to the Supreme Court's decision in *United States v. Fischer*, 603 U.S. ___ (2024), this Court should nevertheless account for Cain's intent and actions directing other rioters to the Senate which underscored this charge when crafting a sentence.

Indeed, with respect to post-*Fischer* cases where the government has dismissed a 18 U.S.C. § 1512 charge and the defendant was sentenced for misdemeanors, Judge Nichols' recent sentencing in *United States v. Sahady*, 21-cr-134, and Judge Chutkan's recent sentencing in *United States v. Sexton*, 23-cr-228 are both instructive. Judge Nichols sentenced Sahady to 5 months of incarceration. Sahady had originally been charged with 18 U.S.C. § 1512, but Sahady was only sentenced for misdemeanors following the government's motion to dismiss the felony charge and a subsequent bench trial. Similar to Cain, Sahady had malintent and encouraged others to disrupt

the certification of the 2020 election. However, Sahady did not engage in violence like Cain did against the unidentified victim on January 6, 2021. Cain deserves a significantly greater sentence.

Judge Chutkan sentenced Sexton to 8 months of incarceration. Similar to Cain, Sexton had been charged with 18 U.S.C. § 1512, but Sexton was only sentenced for misdemeanors following a guilty plea. Like Sexton, Cain encouraged other rioters and intended to disrupt the certification of the 2020 election. Like Sexton, Cain spoke in terms of history and revolution when describing his involvement in January 6, 2021. Unlike Sexton, who only used violence against property, Cain assaulted the unidentified victim. Consequently, Cain deserves a greater sentence.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI. Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639

F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Cain must pay $500 in restitution, which reflects in part the role Cain played in the riot on January 6.[11] ECF 30 at ¶ 9. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* Cain's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR at ¶ 123.

## VII. Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant 12 months of

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

incarceration, 12 months of supervised release, 60 hours of community service, $50 special assessment, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Cain's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:    *s/ Pavan S. Krishnamurthy*
PAVAN S. KRISHNAMURTHY
Assistant United States Attorney
D.C. Bar No. 252831
601 D Street NW
Washington, DC 20001
(202) 252-7862
pavan.krishnamurthy@usdoj.gov